[Cite as *O'Dell v. Vrable III, Inc.*, 2022-Ohio-4156.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| Mark O'Dell, Individually and as Administrator of the Estate of Bebea Joyce O'Dell, | : | Case No. 20CA18 |
| | : | |
| Plaintiff-Appellant, | : | |
| v. | : | DECISION AND <br> JUDGMENT ENTRY |
| VRABLE III, Inc., et al., | : | |
| | : | **RELEASED 11/15/2022** |
| Defendants-Appellees. | : | |

APPEARANCES:

Michael J. Fuller Jr., John R. Cummings, and D. Bryant Cummings, Hattiesburg, Mississippi, for appellant.

Acacia B. Perko and Kenton H. Steele, Columbus, Ohio, for appellees.

Hess, J.

{¶1} Mark O'Dell, ("O'Dell") individually and as administrator of the Estate of Bebea Joyce O'Dell ("Bebea") appeals the trial court's judgment granting partial summary judgment to Vrable III, Inc., Vrable Healthcare, Inc., and Jeremy Long. O'Dell raises the following three assignment of errors: (1) the trial court erred when it dismissed all of his claims except for a medical claim against Vrable III; (2) the trial court erred when it dismissed all claims against Vrable Healthcare; and (3) the trial court erred when it dismissed all claims against Jeremy Long.

{¶2} On O'Dell's first assignment of error, we find that the trial court correctly determined that only one claim survived the Defendants' summary judgment motion.

However, the trial court incorrectly defined that claim as a "medical claim." We find that the single remaining claim is properly characterized as a general negligence claim. Otherwise, we find that the trial court properly dismissed all the remaining claims (i.e., Counts Four/Five, Eight through Eleven, nursing home negligence, punitive damages, fraud, breach of fiduciary duty, premises liability). The trial court incorrectly allowed the case to proceed on Counts Six/Seven, the medical claim, and dismissed Counts One/Two, the general negligence claim. We dismiss Counts Six/Seven and allow the case to proceed on Counts One/Two.  On O'Dell's second and third assignments of error, the trial court properly dismissed Vrable Healthcare and Jeremy Long because O'Dell failed to establish a genuine issue of material fact concerning their negligence.

{¶3}   We sustain in part and overrule in part, O'Dell's first assignment of error. We overrule O'Dell's second and third assignments of error.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶4}   Bebea O'Dell was a resident of Abbyshire Place Skilled Nursing & Rehab Center ("Abbyshire").  Bebea's son, Mark O'Dell, is the estate administrator and plaintiff. Vrable III is the state-licensed operator of Abbyshire; Abbyshire and Vrable III are the same entity. The personnel who work at Abbyshire are either employees of Vrable III or Vrable Healthcare. Some Abbyshire personnel, such as the floor nurses and aides, are employees of Vrable III, while certain management level staff, such as Long, the licensed nursing home administrator of Abbyshire, are employees of Vrable Healthcare.  Thus both Vrable III and Vrable Healthcare employ persons who work at Abbyshire. In addition to employing Long and other management level staff at Abbyshire, Vrable Healthcare is the sole shareholder of Vrable III.

{¶5}   Bebea O'Dell was an 84-year-old woman with dementia when she was admitted to Abbyshire on August 21, 2018. Prior to that, Bebea lived with her son, Mark O'Dell. According to O'Dell, for several years while Bebea lived with him she used a wheeled walker to get around without problems. On August 2, 2018, Bebea had an episode in which she became upset, violent, and threw a flowerpot at O'Dell, hitting him in the head. Bebea was treated in the geriatric psychiatric unit at Holzer Medical Center. It was that episode that triggered Bebea's family to place Bebea in a nursing home for her safety.  According to O'Dell, they chose Abbyshire because it was the only one in the area with a dementia ward. On September 6, 2018, approximately two weeks after she was admitted to Abbyshire, Bebea suffered an unwitnessed fall in her room at about 1:30 a.m.  She was taken to Pleasant Valley Hospital and then transferred to Charleston Area Medical Center where she had surgery to repair a fractured right hip. She was transferred to Holzer Senior Care and passed away on October 16, 2018.

{¶6}   Mark O'Dell, individually and as administrator of Bebea's estate, filed a complaint against Vrable III, Vrable Healthcare, and Long (and other entities that were subsequently dismissed and are not relevant to this appeal). Vrable III, Vrable Healthcare, and Long were defined in the complaint as both "Defendants" and "Nursing Home Defendants" and Long was additionally identified as "Administrator Defendant."  Vrable III, Vrable Healthcare, and Long will be collectively referred to as "Defendants."

{¶7}   O'Dell's complaint contained 11 counts, including two "Medical Malpractice" claims even though none of the defendants were physicians.[1] Though the correct term here is "medical claim," the parties and the trial court used the term "medical malpractice claim" and "medical claim" interchangeably. We will use the term "medical claim." The complaint is summarized here:

> Count One: Corporate Negligence for Non-Lethal Injuries against Vrable III, Vrable Healthcare, and Long. Defendants owed a duty of care to provide oversight and management for Abbyshire for (a) staffing, (b) implementing adequate guidelines, policies and procedures governing licensure violations; (c) adopting adequate guidelines, policies and procedures governing the numbers of nursing personnel; (d) adopting adequate guidelines, policies and procedures for responding to compliance complaints; (e) budgeting and resource allocation; (f) corporate compliance and reporting.
>
> Count Two: Same as Count One but for Lethal Injuries.
>
> Count Three: Negligence against Long – Long owed a duty to prevent reasonably foreseeable injuries via the departments he manages, such as nursing, housekeeping, social services, and maintenance. Long failed this duty in areas of staffing to assist with activities of daily living; staffing for medical care; hygiene and sanitary care; safety measures; screening; budgeting and resource allocation; compliance and reporting.
>
> Count Four: Nursing Home Violations for Non-Lethal Injuries against Vrable III, Vrable Healthcare, and Long. Defendants owed a duty to provide for the well-being of residents by contract or law and they breached this duty in the areas of (a) staffing; (b) implementing adequate guidelines, policies and procedures governing licensure violations; (c) adopting adequate guidelines, policies and procedures governing the numbers of nursing personnel; (d) adopting adequate guidelines, policies and procedures for responding to compliance complaints; (e) compliance with contracts and laws; (f) ensuring residents achieve highest level of well-being; (g) budgeting and resource allocation; (h) corporate compliance and reporting.

---

[1] A medical malpractice claim can only be brought against a physician. *Natl. Union Fire Ins. Co. of Pittsburgh v. Wuerth,* 22 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, ¶ 15 (" '[I]t is well-established common law of Ohio that malpractice is limited to the negligence of physicians and attorneys.' "); *Bartley v. Hearth & Care of Greenfield, L.L.C.,* 4th Dist. Highland No. 12CA13, 2013-Ohio-279, ¶ 8 ("medical employees, such as, nurses and laboratory technicians, are not subject to malpractice claims, but are subject to medical claims"); *Tisdale v. Toledo Hosp.*, 197 Ohio App.3d 316, 2012–Ohio–1110, 967 N.E.2d 280, ¶ 40 (6th Dist.).

Count Five: Same as Count Four but for Lethal Injuries.

Count Six: Medical Malpractice for Non-Lethal Injuries against Vrable III, Vrable Healthcare, and Long. Defendants and their employees owed a duty to render care and services as a reasonably prudent nursing home would render, but failed to do so by (a) failure to notify doctor of significant changes in condition; (b) failure to respond the changes; (c) failure to develop, implement and update adequate resident care plan; (d) failure to maintain records; (e)-(j) failure to provide sufficient supervision for and number of nursing and medication aide personnel to provide various medical care; (k)-(m) failures with respect to the nursing care plan; (n)-(o) failure to adopt guidelines, policies, and procedures for responding to complaints and address deficiencies and problems; (p)-(r) failures with respect to infection management; (s) failure to follow physician orders; (t)-(v) failures with respect to fluid and nutritional needs; (w)-(y) failure to maintain medical records for diagnosis, treatment, and establishment of plan of care; failure to adequately monitor health status; and prevent the development of pneumonia.

Count Seven: Medical Malpractice for Lethal Injuries against Vrable III, Vrable Healthcare, and Long. Same as Count Six except instead of alleging failure to prevent the development of pneumonia, Count Seven specifically alleges a failure to prevent and address the development of pressure sores and infection.

Count Eight: Malice and/or Gross Negligence/Willful, Wanton or Reckless Disregard for Safety against Vrable III, Vrable Healthcare, and Long.

Count Nine: Fraud against Vrable III, Vrable Healthcare, and Long.

Count Ten (misnumbered "Eight" in the Complaint): Breach of Fiduciary Duty against Vrable III, Vrable Healthcare, and Long.

Count Eleven: Premises Liability Claim against Vrable III, Vrable Healthcare, and Long.

In each count, O'Dell described Bebea's injuries as including falls, fractures, urinary tract infections, lice infestations, extreme pain, suffering, mental anguish, embarrassment, fright, and, in the counts for lethal injuries, death. The 60-page, 11-count complaint initially

named four Vrable corporate entities, Long, 10 unidentified John Does, and 10 unidentified "entities."[2]

**{¶8}**   After the parties engaged in extensive discovery, the Defendants filed a motion for partial summary judgment.  Vrable Healthcare and Long sought dismissal from the case entirely on all counts, and Vrable III sought the dismissal of all claims except a medical claim based on allegations that Abbyshire's staff was negligent in their care and treatment of Bebea. The Defendants argued that O'Dell's complaint could be distilled into a single medical claim: Bebea suffered pain and passed away as a result of a hip fracture and Abbyshire negligently caused or failed to prevent that fracture.  They argued that the single medical claim, which is set forth in Counts Six and Seven, could not be transformed into "multiple unrelated causes of action such as fraud, breach of fiduciary duty, premises liability, when Ohio's 'medical claim' statute plainly encompasses all of Plaintiff's claims."

**{¶9}**   The Defendants argued: (1) all the claims alleged by O'Dell are "medical claims" under R.C. 2305.113(E)(3); (2) Abbyshire is a "home" as defined in R.C. 2405.113(E)(3); (3) Vrable III is the owner/operator of Abbyshire; (4) Vrable III employed the personnel at Abbyshire that provided direct care to Bebea; (5) Vrable Healthcare also

---

[2] Though we refrain from commenting on counsel's pleading strategies, one court has harshly criticized what it describes as the "kitchen sink" complaint:

> This Court has repeatedly criticized the filing of "kitchen-sink" or "shotgun" complaints— complaints in which a plaintiff brings every conceivable claim against every conceivable defendant. Such complaints are pernicious for many reasons. For one thing, complaints like the one in this case unfairly burden defendants and courts. The plaintiff who files a kitchen-sink complaint shifts onto the defendant and the court the burden of identifying the plaintiff's genuine claims and determining which of those claims might have legal support. In this case, for example, plaintiffs have essentially coughed up an unsightly hairball of factual and legal allegations, stepped to the side, and invited the defendants and the Court to pick through the mess and determine if plaintiffs may have pleaded a viable claim or two. (Citations omitted.)

*Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F.Supp.2d 1151, 1153 (D.Minn 2011); *see also McCain v. Jenkins*, No. 2:15-cv-1262, 2020 WL 1904712, * 1, fn. 2 (S.D.Ohio Apr. 17, 2020).

employed personnel at Abbyshire, but none of those personnel, including Long, provided any care to Bebea; (6) Vrable Healthcare is not a proper party because it did not employ personnel for Abbyshire who provided direct care to Bebea; (7) Vrable Healthcare is entitled to summary judgment in its favor because O'Dell has no evidence supporting any claims against Vrable Healthcare; (8) Long was the licensed nursing home administrator of Abbyshire but he was responsible for oversight and management, not direct, hands-on care to Bebea; and (9) Long is entitled to summary judgment in his favor because O'Dell has no evidence supporting his claims against Long.

{¶10} Defendants argued that Counts One/Two, Corporate Negligence (or ordinary negligence claims) is a medical claim that arose out of the medical care and treatment of Bebea. And, even if they were ordinary negligence claims, O'Dell has failed to provide evidence that the standard of care applicable to the Defendants was breached or that any breach caused Bebea's injuries and death. On Count Three, Long's Negligence, the Defendants argued that O'Dell's experts did not know who Long was and did not offer any opinion critical of Long. Thus, that claim should be dismissed for lack of evidence. Defendants argued that Counts Four/Five, Nursing Home Violations, alleged a claim based on contract terms, state rules, and federal regulations. Defendants argued that federal nursing home regulations do not create a private cause of action and any claim of breach of contract is subsumed by the medical claim. They also argued that O'Dell failed to produce any evidence to support a nursing home violation claim against Vrable Healthcare. As a result, they argued Claims Four/Five should be dismissed. On Counts Six/Seven, Medical Malpractice, the Defendants argued that this was the single medical claim that could be brought against Vrable III as operator of Abbyshire, based on

allegations that staff hired by Vrable III were negligent in providing care to Bebea. But they contended it could not be brought against Long, the administrator of Abbyshire, or his employer, Vrable Healthcare, due to lack of evidence. For Count Eight, Malice, the Defendants argued that it was in essence a count for punitive damages, which could not be brought on its own. And, O'Dell has provided no evidence that any of the Defendants acted with actual malice or conscious disregard for Bebea's well-being. On Count Nine, Fraud, and Count Ten, Breach of Fiduciary Duty, the Defendants argued that these are both medical claims disguised as fraud and fiduciary duty claims, there has been no evidence regarding fraud, and no fiduciary relationship exists between nursing home residents and the home or its administrator. Therefore, the Defendants were entitled to summary judgment on these causes of action. Last, on Count Eleven, Premises Liability, Defendants argued that this was another disguised medical negligence claim.

{¶11} To support their motion, Defendants included references to O'Dell's complaint, Abbyshire's progress notes that described the incident in which Bebea fell, medical documents from the hospital that performed surgery on Bebea's hip, references to deposition and deposition exhibits of: (1) O'Dell's expert witnesses, Dr. Fannin and Nurse Hill-O'Neill; (2) Civ.R. 30(B) witness James Merrill; and (3) Jeremy Long.

{¶12} O'Dell opposed the motion and argued that Defendants failed to meet their burden under Civ.R. 56 by making conclusory assertions that the nonmoving party has no evidence to prove their case. O'Dell argued that the Defendants must affirmatively demonstrate that, with respect to every essential issue of each count in the complaint, there is no genuine issue of material fact and the Defendants' motion failed to do so.

{¶13} O'Dell argued that Vrable Healthcare was a proper party to the lawsuit because, like Vrable III, it provided personnel for Abbyshire including the nursing home administrator, Long, and the director of nursing. Vrable Healthcare, through its management level employees, owed a duty to Bebea but breached that duty, which resulted in injuries and death. O'Dell argued that his expert, Dr. William Fannin, testified that all persons or entities responsible for the care of Bebea failed to adequately assess her fall risk, did not provide adequate preventative measures and protective equipment concerning falls, and did not create or modify an appropriate care plan concerning her safety with respect to falls. O'Dell's expert nurse, Kathleen Hill-O'Neill, testified that Vrable Healthcare was involved in oversight of Abbyshire because the administrator of Abbyshire reports to Vrable Healthcare and Vrable Healthcare provided policies and procedures for Abbyshire.

{¶14} O'Dell also argued that Long, as the administrator of Abbyshire, was responsible for oversight and management of Abbyshire, including supervision of staff. Nurse Hill-O'Neill testified that the caregivers at Abbyshire fell below the standard of care regarding fall risk and prevention. O'Dell contended that Long, as the administrator of Abbyshire, had non-delegable duties, such as oversight of the daily operations of the home and ensuring that the employees are competent to perform their job. He failed to perform these duties, resulting in harm and death to Bebea.

{¶15} O'Dell argued that his claims were not just a single medical negligence claim, because: (1) Vrable Healthcare is not a medical provider under R.C. 205.113(E)(3) and, thus cannot have a medical claim asserted against it, and (2) not all claims arise from medical diagnosis, care, or treatment. He argued that the Defendants' negligence

related to the ordinary care provided to Bebea related to the provision of activities of daily living.  He explained that his use of the term "corporate negligence" meant "general negligence" as distinct from "medical negligence." The breach of duty concerning matters related to staffing were general negligence claims and Nurse Hill-O'Neill testified that all Defendants failed in this regard.

{¶16} O'Dell argued that his general negligence claims (Counts One, Two, and Three), his two nursing home violations claims (Counts Four and Five) and his medical negligence claims (Counts Six and Seven) all should survive summary judgment based upon the deposition testimony provided by Dr. Fannin and Nurse Hill-O'Neill. He also argued his malice claim (Count Eight), which asserted an entitlement to punitive damages should also survive summary judgment because no enhanced interventions were put in place to prevent Bebea's fall even though Defendants knew that they should have done so. Thus, he contends a jury could conclude that they acted with conscious disregard. O'Dell also contended he had sufficient evidence of fraud (Count Nine) because the admissions agreement for Abbyshire stated that Abbyshire would exercise reasonable care and provide appropriate care and services, but it knew that it had issues providing sufficient staffing and concealed this from Bebea and her family. Similarly, O'Dell argues that there was sufficient evidence that Defendants breached a fiduciary duty (Count Ten) and were liable under premises liability (Count Eleven).

{¶17} The trial court determined that all the claims asserted by O'Dell were medical claims under R.C. 2305.113(E)(3)(d):

> To clarify, the Court finds, as it relates to claims against Vrable Healthcare, Inc., Vrable III, Inc, and Jeremy Long, Administrator of Abbyshire Place Skilled Nursing and Rehab Center, they are "medical claims." They all arise out of the skilled nursing care or personal care services provided by

Abbyshire Place pursuant to the plan of care, medical diagnosis, or treatment of Plaintiff's decedent, Bebea Joyce O'Dell.

The trial court found that all the claims set forth in the complaint were either subsumed by the medical claim or had no basis in law.

{¶18} The trial court interpreted the Defendants' argument that Vrable Healthcare should be dismissed from the case as a corporate veil-piercing argument: "Here, Defendants appear to be arguing that Plaintiff, by bringing claims against Vrable Healthcare, Inc., the parent, is attempting to pierce the corporate veil." The trial court dismissed Vrable Healthcare on the ground that O'Dell failed to bring sufficient evidence regarding piercing the corporate veil. However, later in its decision, the trial court gave an alternative ground for dismissing Vrable Healthcare. The court determined that O'Dell's witnesses failed to provide any evidence that Vrable Healthcare violated any standard of care or caused injury to Bebea. Thus, the trial court determined that O'Dell failed to show any genuine issue of material fact as to Vrable Healthcare's liability.

{¶19} After extensive review of the deposition testimony of Dr. Fannin and Nurse Hill-O'Neill, the trial court dismissed Jeremy Long from the case on the ground that O'Dell's witnesses did not know who he was, what he did, or why he was in the case. They had no opinions that he violated any standard of care as administrator of Abbyshire.

{¶20} The trial court dismissed all the claims against the Defendants except for the medical claim against Vrable III (Counts Six/Seven). The judgment included language under Civ.R. 54(B) that there is no just reason for delay.

{¶21} O'Dell appealed. Vrable III filed a motion to dismiss the appeal on the ground that the entry was not a final, appealable order. We denied the motion and found that an interlocutory appeal is consistent with sound judicial administration and allowed

the appeal to proceed. *O'Dell v. Vrable III*, 4th Dist. Gallia No. 20CA18, Judgment Entry,

Mar. 22, 2021.

## II. ASSIGNMENTS OF ERROR

{¶22}   O'Dell identifies three assignments of error for review:

I. The Trial Court Erroneously Granted the Defendants' Motion Partial Summary Judgment as to all of Plaintiff's Claims except for Medical Malpractice.

II. The Trial Court Erroneously Granted the Defendants' Motion Partial Summary Judgment as to Plaintiff's claims against Defendant Vrable Healthcare, Inc.

III. The Trial Court Erroneously Granted the Defendants' Motion Partial Summary Judgment as to all of Plaintiff's Claims against Defendant Jeremy Long, Administrator.

## III. Review of Summary Judgment

### A. Standard of Review

{¶23}   We review the trial court's decision on a motion for summary judgment de

novo. *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶ 12.

Accordingly, we afford no deference to the trial court's decision and independently review

the record and the inferences that can be drawn from it to determine whether summary

judgment is appropriate. *Harter v. Chillicothe Long–Term Care, Inc.*, 4th Dist. Ross No.

11CA3277, 2012-Ohio-2464, ¶ 12; *Grimes v. Grimes*, 4th Dist. Washington No. 08CA35,

2009-Ohio-3126, ¶ 16.

{¶24} Summary judgment is appropriate only when the following have been

established: (1) that there is no genuine issue as to any material fact; (2) that the moving

party is entitled to judgment as a matter of law; and (3) that reasonable minds can come

to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R.

56(C); *DIRECTV, Inc. v. Levin*, 128 Ohio St.3d 68, 2010-Ohio-6279, 941 N.E.2d 1187, ¶

15. In ruling on a motion for summary judgment, the court must construe the record and

all inferences therefrom in the nonmoving party's favor. Civ.R. 56(C). The party moving for summary judgment bears the initial burden to demonstrate that no genuine issues of material fact exist and that they are entitled to judgment in their favor as a matter of law. *Dresher v. Burt,* 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264 (1996). To meet its burden, the moving party must specifically refer to "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action," that affirmatively demonstrate that the nonmoving party has no evidence to support the nonmoving party's claims. Civ.R. 56(C); *Dresher* at 293, 662 N.E.2d 264. Moreover, the trial court may consider evidence not expressly mentioned in Civ.R. 56(C) if such evidence is incorporated by reference in a properly framed affidavit pursuant to Civ.R. 56(E). *Discover Bank v. Combs*, 4th Dist. Pickaway No. 11CA25, 2012-Ohio-3150, ¶ 17; *Wagner v. Young*, 4th Dist. Athens No. CA1435, 1990 WL 119247, *4 (Aug. 8, 1990). Once that burden is met, the nonmoving party then has a reciprocal burden to set forth specific facts to show that there is a genuine issue for trial. *Dresher* at 293, 662 N.E.2d 264; Civ.R. 56(E). *Am. Express Bank, FSB v. Olsman,* 2018-Ohio-481, 105 N.E.3d 369, ¶ 10-11 (4th Dist.).

### B. Dismissal of All Claims Except Single Medical Claim

{¶25}  For his first assignment of error, O'Dell contends that the trial court erred in determining that all his claims were a single medical claim and in dismissing all his remaining claims except the medical claim alleged in Counts Six/Seven.

### 1. Medical Claim

{¶26}  O'Dell contends that the trial court erred in determining that all his claims are medical claims. He argues that Vrable Healthcare and Long are not identified in R.C.

2305.113(E)(3) as persons or entities against which a medical claim may be filed. Thus, the claims against them cannot be medical claims. He also argues that the trial court incorrectly applied the definition of "medical claim" in R.C. 2305.113(E) too expansively to include acts of ordinary negligence. He cited numerous cases, including one from our district, in which a "fall" is not a medical claim. *E.g., McDill v. Sunbridge Care Ents., Inc.*, 4th Dist. Pickaway No. 12CA8, 2013-Ohio-1618.

{¶27} "Medical claim" is defined in R.C. 2305.113(E)(3). The version effective for this case is set forth here:

> (3) "Medical claim" means any claim that is asserted in any civil action against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home, or residential facility, or against a licensed practical nurse, registered nurse, advanced practice registered nurse, physical therapist, physician assistant, emergency medical technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic, and that arises out of the medical diagnosis, care, or treatment of any person. "Medical claim" includes the following:
>
> (a) Derivative claims for relief that arise from the plan of care, medical diagnosis, or treatment of a person;
>
> (b) Claims that arise out of the plan of care, medical diagnosis, or treatment of any person and to which either of the following applies:
>
> > (i) The claim results from acts or omissions in providing medical care.
> >
> > (ii) The claim results from the hiring, training, supervision, retention, or termination of caregivers providing medical diagnosis, care, or treatment.
>
> (c) Claims that arise out of the plan of care, medical diagnosis, or treatment of any person and that are brought under section 3721.17 of the Revised Code;
>
> (d) Claims that arise out of skilled nursing care or personal care services provided in a home pursuant to the plan of care, medical diagnosis, or treatment.

**{¶28}** "The term 'medical claim' as defined in R.C. 2305.113(E)(3) has two components that the statute states in the conjunctive: (1) the claim is asserted against one or more of the specifically enumerated medical providers and (2) the claim arises out of medical diagnosis, care, or treatment." *Estate of Stevic v. Bio-Med. Application of Ohio, Inc.*, 121 Ohio St.3d 488, 2009-Ohio-1525, 905 N.E.2d 635, ¶ 18. Under R.C. 2305.113(E)(3)(d), claims that "arise out of skilled nursing care or personal care services * * * pursuant to the plan of care, medical diagnosis and treatment" must still nevertheless arise "out of the medical diagnosis, care, or treatment" as required by R.C. 2305.113(E)(3).

### a. Vrable Healthcare and Long Are Persons or Entities Against Whom a Medical Claim May be Brought

**{¶29}** O'Dell contends his claims against Vrable Healthcare and Long are not medical claims, because those two defendants are not medical providers against whom a medical claim may be asserted. The first component of the statute governs who are "specifically enumerated medical providers." Here, a medical claim can be asserted against Vrable III as a "home" and against "any employee or agent of a * * * home." Vrable Healthcare provided management level services and employees to the home and direct services to the home's residents via its therapists. Thus, Vrable Healthcare could have medical claims asserted against it if, through the services it provides the home's residents, it is acting as an "agent" of the home. And Vrable Healthcare, as the employer of Long and certain other employees at Abbyshire, could have respondeat superior liability for medical claims asserted against any employees it hires to provide medical care to the home's residents. *See Weiler v. Knox Community Hosp.,* 5th Dist. Knox. No. 20CA18, 2021-Ohio-2098, ¶ 20 (" '[g]enerally, an employer or principal is vicariously liable

for the torts of its employees or agents under the doctrine of respondeat superior.' " *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438, 628 N.E.2d 46 (1994)); *Henik v. Robinson Mem. Hosp.*, 9th Dist. Summit No. 25701, 2012-Ohio-1169, ¶ 18-19 (medical claim against a nurse could be asserted against nurse's employer under theory of respondeat superior). Long was the administrator of the home. As a result, Long could have medical claims asserted against him as an agent of the home. *Howard v. HCR ManorCare, Inc.*, 2018-Ohio-1053, 99 N.E.3d 429, ¶ 162 (2d Dist.) (an administrator of the home could be considered an "agent," and would, therefore fall within the statutorily enumerated medical providers in R.C. 2305.113(E)(3)).

{¶30} We reject O'Dell's argument that medical claims could not be brought against Vrable Healthcare and Long. They, particularly Long, could be considered "agents" of the home under R.C. 2305.113(E)(3). And, Vrable Healthcare, as the employer of Long and other management level personnel at the home, could have respondeat superior liability for medical claims brought against its employees. The trial court correctly noted that Long was the administrator and could have medical claims asserted against him as "the provider home's employee or agent as administrator." The trial court also correctly recognized that Vrable Healthcare could have "vicarious liability" for the acts of agents and employees. Ultimately, because the trial court determined that O'Dell failed to present evidence that Vrable Healthcare or Long violated any standard of care, it dismissed the claims against these two defendants – it dismissed them not because they were not "medical providers" under the statute, but because there was insufficient evidence to survive the summary judgment motion. O'Dell challenges the trial

court's decision to dismiss Vrable Healthcare and Long on evidentiary grounds in his second and third assignment of error and we will address those arguments then.

### b. The Claim Must Arise Out of the Medical Diagnosis, Care, or Treatment of Any Person

**{¶31}** The second prong of the statutory definition of "medical claim" is that the claim must arise out of medical diagnosis, care, or treatment, where "care" is "the prevention or alleviation of a physical or mental defect or illness." *Browning v. Burt,* 66 Ohio St.3d 544, 557, 613 N.E.2d 993, 1003 (1993). "Care" does not have a broad, general meaning, but refers to medical care – care to treat illnesses.

**{¶32}** As we explained in *McDill,*

> The term " 'care' * * * should not be broadly interpreted." *Browning v. Burt,* 66 Ohio St.3d 544, 557, 613 N.E.2d 993 (1993). Rather, it must be considered in its particular context to determine its specific legal meaning. *Id.* As used in R.C. 2305.113(E)(3), the term "care" means "the prevention or alleviation of a physical or mental defect or illness." *Id.,* paragraph one of the syllabus. The terms " 'medical diagnosis' and 'treatment' are terms of art having a specific and particular meaning relating to the identification and alleviation of a physical or mental illness, disease, or defect." *Id.* at 557, 613 N.E.2d 993.

*McDill,* 2013-Ohio-1618, at ¶ 16. "[N]ot all care that transpires in a hospital or nursing home involves 'medical care' within the meaning of R.C. 2305.113(E)(3) * * * it is possible to assert a claim for ordinary negligence against a nursing home or facility." *McFarren v. Canton,* 2016-Ohio-484, 59 N.E.3d 652, ¶ 44 (5th Dist.); *Carte v. The Manor at Whitehall,* 10th Dist. Franklin No. 14AP-568, 2014-Ohio-5670, ¶ 29.

**{¶33}** "To identify medical care, as opposed to general care, courts look at whether the conduct was part of a medical test, procedure, or treatment, was ordered by a medical professional, or required medical expertise or professional skill." *Wagers v. Kettering Affiliated Health Servs.,* 2d Dist. Montgomery No. 28192, 2020-Ohio-11, ¶

11, *appeal not allowed*, 158 Ohio St.3d 1489, 2020-Ohio-1634, 143 N.E.3d 535. "Medical claim" includes "a claim for a hospital employee's negligent use of hospital equipment while caring for a patient which allegedly results in an injury to the patient." *Rome v. Flower Mem. Hosp.*, 70 Ohio St.3d 14, 635 N.E.2d 1239 (1994), syllabus.

**{¶34}** The trial court determined that all the claims asserted by O'Dell were medical claims. The trial court noted that Dr. Fannin was asked "Your opinions involved the care provided to the patient, correct?" and he answered, "That's correct. Yes." Similarly, the trial court noted that Nurse Hill-O'Neill was asked, "Would you agree with me that your opinions in this case relates to the care and treatment that was provided to Miss O'Dell at Abbyshire Place?" and she answered, "Yes." The trial court then concluded that all of O'Dell's claims were medical claims, "They all arise out of the skilled nursing care or personal care services provided by Abbyshire Place pursuant to the plan of care, medical diagnosis, or treatment of Plaintiff's decedent, Beabe [sic] Joyce O'Dell."

**{¶35}** However, while we find that both experts discussed the "care" that Bebea had at Abbyshire, their testimony was focused on fall prevention care. Here, the facts involve an unwitnessed fall at approximately 1:30 a.m. in Bebea's room. The Abbyshire nursing note described the incident at 1:29 a.m. on September 6, 2018:

> Standing at duty station and heard yelling from residents' room. Went in to assess and she [Bebea] was on the floor. Moderate size hematoma to back of head and a dent in the bathroom door. Small skin tear to right lower arm and slight discoloration to her right lower leg. She was complaining that her right leg was hurting and attempting to get up off of the floor. She would not lay still because she wanted to get up and call her son. AlsWheelchair was placed behind her and she was placed sitting. She was unable to move her right leg at that time as every time I touched it she screamed. Slight swelling noted to right lower leg as well. Ice placed to back of head, neuro checks started per policy and skin tear cleansed and dressing applied. VS initially 132/65, 98.4, 93, 16. Doctor Toothman notified and received order to send to PVH for treatment and evaluation. DON notified as well as her sons which

will be meeting her at the hospital. Also once the EMTs got her on stretcher, her right foot was turned outward.

{¶36} Both Dr. Fannin and Nurse Hill-O'Neill testified that Bebea was at an increased risk for falling and Abbyshire did not place enough fall prevention measures in place to prevent her fall. Dr. Fannin summed up his understanding of the case, "[B]asically, the fact that [Bebea] was a high fall risk. That adequate measures weren't taken to prevent the fall. That adequate initial assessments to help prevent that and reassessments and changes in regards to [Bebea] were not performed to prevent the fall. [Bebea] had [a] fall-significant injury, subsequently had a marked decline because of that, and ultimately died with some substantial contribution from that injury." He stated that Abbyshire did not "dignify the fall risk that she had" when Bebea was initially placed there. "And then, as time went by, they did not provide adequate preventative measures to help her not have falls and to hopefully lessen the injury if she did have one." Dr. Fannin opined that Abbyshire "considered her as a fall risk, but they didn't dignify it with the protective measures that I feel were appropriate."

{¶37} Dr. Fannin testified that some safety measures were in place, such as "a rolling walker as a safety measure," but that there were not "adequate changes made in her – in her care plan and approach to providing a safe environment." Dr. Fannin testified that "observant" and "experienced" people would have "put in some more protective measures for [Bebea]." Dr. Fannin testified that the standard of care requires "that you have to protect [Bebea] from harm and injury. You have to provide a safe environment. That's what it says." Dr. Fannin testified that a bed alarm would have prevented Bebea's fall. He also believed that pads on the floor and a lower bed height would have helped prevent the fall or minimize fall injuries but there was "nothing about changing any of the

safety features that would help [Bebea] in preventing the fall or help to lessen the injury if it happened." Dr. Fannin criticisms of Abbyshire's fall intervention included the failure to use blue fall mats next to the bed, failure to use a low bed, failure to use a defined perimeter mattress or "scoop mattress," failure to use an alarm on the bed and the wheelchair, failure to use a motion sensor device, failure to put nonskid strips on the floor of Bebea's room, and the failure to use a bed bolster to keep Bebea in place.

{¶38} Similarly, Nurse Hill-O'Neill testified that Abbyshire "fell below the standard of care in regard to fall risk and fall prevention as far as assessment and then care and treatment to maintain [Bebea's] safety and well-being." She testified that the standard of care required homes "to do everything we could to prevent [sic] resident safety." Nurse Hill-O'Neill was critical of Abbyshire for failing to use "tab alarms, sensor alarms, perimeter mattresses, blue fall mats, low beds and many other interventions. We don't see them being responsive to that and doing that in her case, in Miss O'Dell's case."

{¶39} Nurse Hill-O'Neill testified that every area in which Abbyshire failed to provide the standard of care was related to its fall prevention efforts with Bebea. She testified Abbyshire was "not doing everything you're supposed to do to promote a safe environment and the resident's safety and well-being. You're not addressing fall risk adequately and coming up with proper interventions as we have been talking about, and timely interventions." She also testified that in her opinion Abbyshire's lack of fall prevention placed it out of compliance with state and federal regulations: "In regards to, again, fall risk, accident prevention, maintaining a safe environment" and all assessment and care planning related to fall prevention. Nurse Hill-O'Neill testified that Abbyshire failed to protect Bebea from harm "by way of not adequately responding to her fall risk."

Nurse Hill-O'Neill believed that an alarm coupled with other fall prevention measures would have prevented Bebea's fall: "I believe that it could have prevented the fall if they would have put these interventions in place that we're talking about that they had as part of their policies. It could have prevented the fall. These measures could have prevented the fall. * * * Low beds, mats and all the other things that they had available."

{¶40} Falls can either be medical claims or general negligence claims, depending upon the factual circumstances. When a person falls because of the negligent use of medical equipment during a medical procedure, it is a medical claim. In *Rome v. Flower Mem. Hosp.* 70 Ohio St.3d 14, 635 N.E.2d 1239 (1994), the Supreme Court of Ohio held that the fall was a "medical claim" where a radiological intern failed to fasten the footboard to the base of radiology table causing the patient to fall when table was tilted for the X-ray procedure.

> [W]e find that the process of securing Barbara Rome to a radiology table is *ancillary to and an inherently necessary part of the administration of the X-ray procedure* which was ordered to identify and alleviate her medical complaints. Furthermore, at the time of her injury, Mrs. Rome was a patient at Flower and was being assisted by an employee of Flower, which *employee was required to exercise a certain amount of professional expertise in preparing the patient for X-ray.* Accordingly, we conclude that Rome's claim arises out of "medical diagnosis, care, or treatment" relating to the identification and alleviation of a physical or mental illness, disease, or defect. (Emphasis added.)

*Id.* at 16.

{¶41} Where a patient fell from a wheelchair during transport to physician-ordered physical therapy, the Supreme of Ohio held that the fall was a medical claim.

> This therapy was ordered by his physician as part of his rehabilitation from knee surgery. Following standard practice, a hospital employee took Eager to and from the physical therapy department in a wheelchair. Thus, we find that the transport of Eager from physical therapy was ancillary to and an inherently necessary part of his physical therapy treatment. Furthermore,

> Eager was a patient of St. Vincent Medical Center and was assisted by an employee of St. Vincent who was required to use a certain amount of professional skill in transporting the patient in the wheelchair. Clearly, this transport arose out of Eager's physical therapy treatment. Accordingly, we conclude that Eager's injury resulted from his "care, or treatment" while at St. Vincent Medical Center

*Id.* at 16-17; *Long v. Warrant Gen. Hosp.*, 121 Ohio App.3d 489, 700 N.E.2d 364 (11th Dist. 1997) (patient who fell after orderly directed him to walk from bed to gurney for transport to doctor-ordered colonoscopy had a "medical claim" for the injuries sustained in the fall because he was obtaining physician-ordered medical diagnostic testing and the need to transport arose out of the diagnostic testing).

{¶42} However, where the fall does not arise out of medical diagnosis, care, or treatment, the fall gives rise to a general negligence claim, not a medical claim. In *McDill*, we found that a patient who fell while washing her hands in the bathroom of a skilled nursing facility had a general negligence claim, not a medical claim. The patient had called for assistance to use the bathroom at 2:00 a.m. Two aides assisted her, but when she began to wash her hands, "the two aides 'inattentively and negligently allowed [appellant] to fall backwards, landing on her buttocks.' " (Brackets sic.) *McDill,* 2013-Ohio-1618, at ¶ 3. We found that she did not have a medical claim because she was not being transported to or from a medical treatment, nor did her fall arise out of the negligent use of medical equipment during a medical procedure:

> In the case sub judice, we agree with appellant that her injury did not arise out of medical diagnosis, care, or treatment. Unlike *Burt* and *Rome,* appellant's injury did not occur at a time when she was being transported to or from a medical procedure. It also did not occur due to an employee's alleged negligent use of hospital equipment. Instead, according to the complaint, appellant's injury occurred as she washed her hands after a bathroom visit. Escorting appellant from the bathroom to the sink to wash her hands did not involve "the prevention or alleviation of a physical or mental defect or illness." *Browning*, paragraph one of the syllabus. It also

did not relate to the "identification and alleviation of a physical or mental illness, disease, or defect." *Id.* at 557, 613 N.E.2d 993.

*McDill* at ¶ 23.

{¶43} In reaching our conclusion in *McDill*, we analyzed a similar case from the First District Court of Appeals, *Conkin v. CHS-Ohio Valley, Inc.,* 1st Dist. Hamilton No. C-110660, 2012-Ohio-2816. In *Conkin,* a nursing home resident fell when an employee failed to properly transfer her to a "Hoyer lift" so that she could shower. The resident filed a negligence complaint against the facility and the employee. The appellate court determined that the resident's claim was a general negligence claim, not a medical claim. In *McDill*, we reviewed the four factors the First District Court of Appeals considered in deciding whether the claim was a medical claim:

> In reaching its decision, the court examined four factors: (1) whether the equipment "was used for 'the prevention or alleviation of a physical or mental defect or illness;' " (2) "whether the equipment was 'an inherently necessary part of a medical procedure;' " (3) whether "use of the equipment 'arose out of' a physician ordered treatment;" and (4) whether "use of the equipment required a 'certain amount' of professional expertise or professional skill." *Id.* at ¶ 9, quoting *Browning,* 66 Ohio St.3d at 557, 613 N.E.2d 993, and *Rome,* 70 Ohio St.3d at 16–17, 635 N.E.2d 1239

> After considering the above factors, the court determined that the patient's claims did not constitute "medical claims." *Id.* at ¶ 11, 635 N.E.2d 1239. The court explained:

>> "Even if the Hoyer lift was used for the alleviation of problems associated with [the patient]'s range of motion, there is no indication at this point in the proceedings that the use of the Hoyer lift was an inherent part of a medical procedure or that it arose out of physician ordered treatment. And it is also unclear whether a 'certain amount' of professional expertise or professional skill may have been required to transfer [the patient] into the lift."

> *Id.*

*McDill* at ¶ 21-22.

{¶44} In *Christian v. Kettering Med. Ctr.*, 85 N.E.3d 804, 2017-Ohio-7928 (2d Dist.), a woman arrived in a private vehicle to the emergency department of a hospital. She fell to the ground when she was dropped by a nurse who was attempting to transfer her from the car to a wheelchair for transport into the hospital. The court determined that the transfer from the car to the wheelchair was not an inherent part of a medical procedure or physician-ordered treatment and did not give rise to a "medical claim." The nurse's act of transferring the woman from the car to the wheelchair, "was simply for the purpose of allowing [the woman] to enter the hospital, where she could then seek medical attention." *Id.* at ¶ 31.

{¶45} *Christian* included a summary of cases from other appellate districts which found falls give rise to general negligence claims, not medical claims:

> [C]ourts have held that the plaintiff did not assert a "medical claim" when the injury allegedly arose from (1) falling out of a wheelchair while on the way to lunch at an assisted living facility, *Eichenberger v. Woodlands Assisted Living Residence, L.L.C.*, 2014-Ohio-5354, 25 N.E.3d 355 (10th Dist.); (2) falling while attempting to stand from a wheelchair outside the hospital upon discharge, *Hill v. Wadsworth–Rittman Area Hosp.*, 185 Ohio App.3d 788, 2009-Ohio-5421, 925 N.E.2d 1012 (9th Dist.); (3) falling while going from a hospital bed to the bathroom, *Balascoe v. St. Elizabeth Hosp. Med. Ctr.*, 110 Ohio App.3d 83, 673 N.E.2d 651 (7th Dist.1996); and (4) falling backwards while washing hands in a bathroom while receiving rehabilitative care following surgery, *McDill v. Sunbridge Care Ents., Inc.*, 4th Dist. Pickaway No. 12CA8, 2013-Ohio-1618 [2013 WL 1716748]. In each of these cases, the injury did not arise out of medical diagnosis, care, or treatment. (Brackets sic.)

*Christian* at ¶ 21.

{¶46} In *Carte v. The Manor at Whitehall,* 10th Dist. Franklin No. 14AP-568, 2014-Ohio-5670, a 76-year-old man who was a resident at a nursing home fell while a staff member was assisting him as he moved from the toilet to a bed. He allegedly had a medical condition that placed him at an increased risk for falling.  No medical equipment

was used to transfer Carte to and from the bathroom so the issue central to the court's analysis was whether the staff at the nursing home were "providing medical care within the meaning of the statute when assisting Carte to and from the bathroom." *Id.* at ¶ 19. The Tenth District Court of Appeals reviewed several fall cases, including several discussed by the Second District Court of Appeals in *Christian,* such as *Rome, Conkin, Eichenberger, Balasco,* and *McDill, supra,* and determined that the fall gave rise to a general negligence claim, not a medical claim:

> Here, we agree with the reasoning of the court in *McDill,* that Carte's injury arose because he had to use the bathroom not because he was in the process of receiving medical diagnosis, care or treatment. We fail to see how staff assistance to and from the bathroom involved "the prevention or alleviation of a physical or mental defect or illness." *Browning* at 557, 613 N.E.2d 993.

*Carte* at ¶ 25. The court also found that the alleged existence of a physician order for a two-person transfer was not determinative to the analysis and did not convert the claim to a medical claim. *Id.* at ¶28.

{¶47}   In *McFarren v. Canton,* 2016-Ohio-484, 59 N.E.3d 652 (5th Dist.), a case factually like the one here, a 91-year-old woman was a resident at a residential care facility operated by Emeritus of Canton, which provided assisted living, memory care, and respite/short term care. She suffered confusion and forgetfulness, required assistance with mobility issues, required safety checks for fall prevention, had an unsteady gait, and required assistance with transfers.  One evening at approximately 6:40 p.m. an aide found the woman lying beside her bed on the floor of her room. She fractured her left hip and passed away five days later. Her estate brought a lawsuit and Emeritus of Canton moved for summary judgment to dismiss the suit as a "medical claim" that was brought outside the one-year statute of limitations.

**{¶48}** In analyzing the issue of whether the claim involved "medical care" under R.C. 2305.113(E)(3), the appellate court reviewed many of the cases we discussed above. It determined that the claim was a general negligence claim, not a medical claim, because there was no evidence that she was undergoing medical care or treatment at the time of her fall:

> In this case, [plaintiff] claims that Mrs. Rinker fell and broke her hip because Emeritus and its staff deviated from the standard of care. Based on the line of cases examining injuries within residential facilities, nursing homes, and hospitals, the issue to analyze is whether the injury occurred as part of some type of medical test or procedure, was ordered by a doctor, or that it required any medical expertise or professional skill. We review the facts in a light most favorable to the non-moving party. The Emeritus staff found Mrs. Rinker laying prostrate on the floor of her room. There is no Civ.R. 56 evidence that she was receiving medical care at the time of her fall. Simply because Mrs. Rinker was a resident of Emeritus at the time of the fall does not render her claim for negligence a medical claim. In this case, [plaintiff's] claim for negligence states a claim for common law negligence, not a medical claim. [Plaintiff's] claim for negligence was filed within the statute of limitations.

*McFarren* at ¶ 47.

**{¶49}** Similarly, we find that Bebea's claim was not a medical claim. Bebea was found on the floor of her room at 1:30 a.m. No one witnessed her fall. She was not being transported to or from a medical procedure. There was not any evidence that she was being assisted with any medical equipment for the purpose of receiving medical diagnosis, care, or treatment, nor was she using medical equipment that was ancillary to and an inherently necessary part of a medical procedure. If we infer that she was attempting to use the bathroom, her use of the bathroom did not involve the prevention or alleviation of a physical or mental defect or illness. Her injury did not arise out of medical diagnosis, care, or treatment and, therefore, did not give rise to a medial claim. Her claim states a common law general negligence claim, not a medical claim.

{¶50} Bebea's complaint initially included medical claims in Counts Six and Seven which alleged that the Defendants failed to prevent, monitor, and treat the development of pneumonia, bedsores, and urinary tract and lice infections. The failure to treat physical illness or properly treat infections is a claim based on the omission of medical treatment and care and satisfies the definition of medical claim under R.C. 2305.113(E). *Wagers v. Kettering Affiliated Health Servs.*, 2d Dist. Montgomery No. 28192, 2020-Ohio-11, ¶ 12-13; *Lerner v. Broadview NH, LLC*, 2017-Ohio-8001, 98 N.E.3d 1014 ¶ 16 (10th Dist.) (failure to treat bed sores, failure to insure nasal cannula stayed in place, and failure to deliver medications were medical claims.)

{¶51} However, O'Dell failed to present any evidence in response to the summary judgment motion to support these medical claims. There was no evidence that Bebea suffered bed sores or any infections other than a urinary tract infection and a lice infestation. Dr. Fannin testified that Abbyshire's treatment of Bebea's urinary tract infection was appropriate. Dr. Fannin testified, "She had a urinary tract infection which was addressed appropriately and treated appropriately." When asked for her opinions related to Bebea's urinary tract infection, Nurse Hill-O'Neill had no criticism of Abbyshire's diagnosis and treatment of it. Instead, she testified that it was another fall indicator. The only other potential medical issue Dr. Fannin addressed was Bebea's head lice, but he admitted that he did not know enough to render an opinion, "I don't know the time frame of it. It could've been that she had them before she got there. I don't know." He offered no opinion that Abbyshire had been negligent in any manner in the treatment and care of Bebea's head lice.

{¶52} Concerning the allegation that Abbyshire failed to prevent the development of pneumonia, Dr. Fannin and Nurse Hill-O'Neill acknowledged that Bebea developed pneumonia after she left Abbyshire and it was a consequence of immobility from the fall. Dr. Fannin testified, "It's more likely than not, in all medical probability, that the reason she continued to decline and ultimately develop pneumonia and ultimately died was substantially contributed to by that injury at Abbyshire." Nurse Hill-O'Neill testified, "she suffered a very common complication following that hip fracture that relates to the overall associated decline in mobility to hip fractures and the elderly. That would be pneumonia." Therefore, the pneumonia was allegedly additional damages she suffered because of the fall and did not give rise to a separate medical claim. In other words, there was no evidence that Abbyshire failed to properly prevent, diagnosis, or treat Bebea's pneumonia; it was part of Bebea's injuries resulting from Abbyshire's alleged negligence.

{¶53} For these reasons we find that the trial court erred when it found the only surviving claim was a medical claim. We find that the claim that Abbyshire's negligence resulted in Bebea's fall, injuries, and death is a general negligence claim, not a medical claim. Therefore, instead of dismissing the general negligence claim in Counts One/Two and allowing the medical claim in Counts Six/Seven to proceed, the trial court should have dismissed the medical claim in Counts Six/Seven and allowed the general negligence claim in Counts One/Two to proceed.

{¶54} As for Counts Four/Five (nursing home breaches of duty of care – nonfatal and fatal), it appears that the trial court dismissed these claims because it determined they stated the same medical claim as the one asserted in Counts Six/Seven. We agree that Counts Four/Five should be dismissed as redundant, but for a different reason. We

find no legal distinction between Counts Four/Five and Counts One/Two. All four claims state a negligence claim against the Defendants. O'Dell's experts testified that Abbyshire breached its duty of care to Bebea in the way it assessed her fall risk and implemented fall prevention measures. This general negligence claim is set forth in Counts One/Two. If O'Dell has any evidence that Abbyshire's fall prevention measures violated a government regulation, it might use the alleged violations as evidence of negligence (to support the claim in Counts One/Two)[3] but it cannot be used to assert a claim for negligence per se. *See Lang v. Beachwood Pointe Care Ctr.*, 2017-Ohio-1550, 90 N.E.3d 102, ¶ 74. O'Dell appears to concede as much in its brief. Therefore, we find that Counts Four/Five were, for a different reason, properly dismissed.

2. Malice Claim – Punitive Damages

**{¶55}** Count Eight is a claim for punitive damages and asserts that the defendants acted with malice and gross negligence, with a willful, wanton, or reckless disregard for Bebea's safety.

**{¶56}** Ohio recognizes no separate cause of action for punitive damages:

> In Ohio, no civil action may be maintained simply for punitive damages. Rather, punitive damages are awarded as a mere incident of the cause of action in which they are sought. Thus, compensable harm stemming from a cognizable cause of action must be shown to exist before punitive damages can be considered.

*Moskovitz v. Mt. Sinai Med. Ctr.,* 69 Ohio St.3d 638, 650, 635 N.E.2d 331, 342 (1994); *Whetstone v. Binner*, 146 Ohio St.3d 395, 2016-Ohio-1006, 57 N.E.3d 1111, ¶ 20 ("Punitive damages are not an independent cause of action; rather, they arise incident to compensable harm").

---

[3] We take no position on whether O'Dell may introduce government regulations as evidence at trial as that issue is not before us.

**{¶57}** Under R.C. 2315.21(C) punitive damages cannot be recovered in a tort action unless the jury has awarded compensatory damages and the plaintiff can show malice:

(C) * * * , punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

(1) The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

(2) The trier of fact has returned a verdict or has made a determination pursuant to division (B)(2) or (3) of this section of the total compensatory damages recoverable by the plaintiff from that defendant.

**{¶58}** The Supreme Court of Ohio has described malice required for an award of punitive damages as:

[A]ctual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174, 1176 (1987).

**{¶59}** O'Dell argued in his opposition to the summary judgment motion that he had sufficient evidence to support punitive damages because "there were known staffing issues," "the repeated failures related to [Bebea's] care" and "Nurse Hill-O'Neill's opinion that [Bebea] suffered abuse and neglect, supports punitive damages in this matter." However, Nurse Hill-O'Neill provided no testimony that Bebea suffered abuse as that term is defined in R.C. 3721.21. The term "abuse" includes physical, psychological, or sexual. Under R.C. 3721.21(H)-(J):

> (H) "Physical abuse" means knowingly causing physical harm or recklessly causing serious physical harm to a resident through either of the following: (1) Physical contact with the resident; (2) The use of physical restraint, chemical restraint, medication that does not constitute a chemical restraint, or isolation, if the restraint, medication, or isolation is excessive, for punishment, for staff convenience, a substitute for treatment, or in an amount that precludes habilitation and treatment.
>
> (I) "Psychological abuse" means knowingly or recklessly causing psychological harm to a resident, whether verbally or by action.
>
> (J) "Sexual abuse" means sexual conduct or sexual contact with a resident, as those terms are defined in section 2907.01 of the Revised Code

The term "neglect" is defined in R.C. 3721.21(D):

> (D) "Neglect" means recklessly failing to provide a resident with any treatment, care, goods, or service necessary to maintain the health or safety of the resident when the failure results in serious physical harm to the resident. "Neglect" does not include allowing a resident, at the resident's option, to receive only treatment by spiritual means through prayer in accordance with the tenets of a recognized religious denomination.

{¶60} When we review the portion of her deposition testimony cited by O'Dell in support of punitive damages, we find that Nurse Hill-O'Neill simply confirms that it is "anticipated" that she will testify that Abbyshire's conduct constituted abuse and neglect. Further, she conflates the terms "abuse" and "neglect" as though they share a singular meaning. She includes the definition of neglect as part of the definition of abuse:

> Again, to the best of my recollection, I think that the definition that they have here in this policy on abuse comports with that deprivation of an individual, including a caretaker of goods or services that are necessary to obtain or maintain physical, mental and psychosocial well-being. It goes on from there about verbal abuse, sexual abuse, physical and mental abuse.

Nurse Hill-O'Neill incorrectly testified that "abuse" is the deprivation of goods or services necessary to maintain physical, mental, or psychosocial well-being, but that is the definition of "neglect" (when done recklessly), not the definition of "abuse." Moreover, even if Nurse Hill-O'Neill believed that Abbyshire's conduct constituted "abuse and

neglect," she identified no abusive conduct by Abbyshire. And, there is nothing in Nurse Hill-O'Neill's testimony that provides evidence that Abbyshire acted out of hatred, ill-will, or a spirit of revenge. Likewise vague allegations of "staffing issues" and "repeated failures in Bebea's care" are not evidence of hatred, ill-will, or a spirit of revenge. Finally, O'Dell claimed that Abbyshire's director of nursing testified that there must be a new intervention with each fall and that a new intervention for Bebea was not put in place after Bebea had a knee buckling incident about a week before the fall that fractured her hip. O'Dell argued that this testimony was sufficient to establish an entitlement to punitive damages. However, in the testimony O'Dell references, the nursing director appears to testify that Abbyshire did, in fact, implement a new intervention – a gait belt for assistance:

Q. And what was the intervention you're referring to on the care plan?

A. "Staff educated to use the gait belt to assist in the UA," the urinalysis.

However, even if O'Dell is correct and Abbyshire's nursing director testified that no intervention was put in place after Bebea's knee buckling incident, the failure to implement an intervention may, depending upon the facts, be evidence of negligence, but it is not evidence of hatred, ill-will, a spirit of revenge, or a conscious disregard for Bebea.

{¶61} None of the witnesses O'Dell identified to support his request for punitive damages provided evidence that Abbyshire's conduct rose to the level of hatred, ill-will, revenge, or a conscious disregard for the safety of Bebea. We find that the trial court properly dismissed O'Dell's request for punitive damages in Court Eight because it is not an independent cause of action and because there is no genuine issue of material fact about the lack of evidence of malice.

### 3. Fraud

**{¶62}** Count Nine alleges a fraud claim in which O'Dell contends that the Defendants intentionally fraudulently concealed material facts from Bebea and her family during the admissions process.

**{¶63}** Under Ohio law, common law fraud requires proof of the following six elements:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991).

**{¶64}** O'Dell admitted in his response to the summary judgment motion that "there has been scant evidence of verbal affirmative representations by Defendants." However, he claims that written fraudulent representations were made in a 2017 "Heath Care Center Residency Agreement," which states "Abbyshire * * * shall exercise reasonable care toward the Resident based on his or her known condition" and, "Abbyshire Place is committed to making reasonable efforts to provide the resident with appropriate care and services with respect to his or her known condition."  O'Dell also argued that there were "issues with providing sufficient staff" and that Bebea's family members testified that "a patient advocate at Holzer helped us talk to different places * * * Abbyshire was one that basically was the only one local that could accept her because they have a * * * dementia ward." O'Dell argued that this evidence satisfied the first element of the fraud claim, a concealment of a fact.

{¶65} We disagree. Even if the 2017 Residency Agreement applied to Bebea's August 2018 residency, the failure of Abbyshire to honor statements made in the agreement might give rise to a breach of contract claim; but, without evidence that Abbyshire made those statements knowing that they were false when they were made and with the intent of misleading Bebea and her family, they are not evidence of fraud. Moreover, O'Dell's response included no evidence to establish any of the other five remaining elements of fraud. He simply alleges that the concealed facts were material, were made with the knowledge they were false, with the intent to mislead Bebea's family and have them place her at Abbyshire.

{¶66} The trial court rejected O'Dell's argument because: (1) O'Dell conceded there was of "scant evidence of verbal affirmative representations" and (2) the Health Care Residency Agreement was dated and signed on January 20, 2017. Bebea was admitted in August 2018. Thus, the trial court found the agreement had no evidentiary value and was irrelevant.[4]

{¶67} We find that O'Dell has failed to establish a genuine issue of material fact concerning his fraud claim. There is no evidence that any of the Defendants knowingly made a false representation or made it with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, or that they did so with the intent of misleading Bebea and her family into relying upon it. The trial court properly dismissed O'Dell's fraud claim.

---

[4] According to the deposition testimony of Gary O'Dell, Bebea was placed in Abbyshire twice. Once in late 2016 or early 2017 for approximately two to four weeks for physical therapy due to a bleeding ulcer. Therefore, the Health Care Center Residency Agreement O'Dell submitted dated January 20, 2017 was likely executed for Bebea's first stay in 2017. The record contains no similar agreement for Bebea's August 2018 residency.

## 4. Breach of Fiduciary Duty

**{¶68}** Count Ten alleges that the Defendants owed Bebea a fiduciary duty which they breached by failing to provide the appropriate level of care to her. Defendants argued that Ohio does not recognize a fiduciary relationship between a nursing home and its residents. The Defendants also cite an Ohio case that rejected a breach of fiduciary claim brought by a patient against a physician. *See Lykins v. Miami Valley Hosp.*,157 Ohio App.3d 291, 323, 2004-Ohio-2732 (2d Dist.2004). In response, O'Dell conceded that there is no Ohio authority establishing a fiduciary relationship between a resident and a nursing home, but he cited a Louisiana case in which a fiduciary relationship was recognized*. See Petre v. Living Ctrs.-East, Inc*. 935 F.Supp. 808 (E.D. La 1996).

**{¶69}** Very few courts across the country have imposed a fiduciary relationship upon a resident and a nursing home. In *Manor Care, Inc. v. Douglas*, 234 W.Va. 57, 763 S.E.2d 73 (2014) the court dismissed a claim for breach of fiduciary duty by a nursing home resident and explained that a fiduciary relationship can only arise when both parties to the relationship agree to it:

It is well established that

> "[t]he fiduciary duty is '[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person. It is the highest standard of duty implied by law [.]' " *Elmore v. State Farm Mut. Auto. Ins. Co.,* 202 W.Va. 430, 435, 504 S.E.2d 893, 898 (1998) (quoting Black's Law Dictionary 625 (6th ed.1990)).

*Napier v. Compton,* 210 W.Va. 594, 598, 558 S.E.2d 593, 597 (per curiam) (2001). *See also McKinley v. Lynch,* 58 W.Va. 44, 57, 51 S.E. 4, 9 (1905) (observing that a fiduciary relationship exists "whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another"). Furthermore, this Court has explained that,

> "[a]s a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." 36A C.J.S. *Fiduciary,* p. 385 (1961).

*Elmore v. State Farm Mut. Auto. Ins. Co.,* 202 W.Va. 430, 436, 504 S.E.2d 893, 899 (1998).

> This Court has not previously recognized a cause of action for breach of fiduciary duty against a nursing home. In other words, we have not ruled that a nursing home owes a fiduciary duty to its residents or what the parameters of such a duty would be. Based upon the particular facts of the instant matter, and the small number of jurisdictions who have expressly recognized such a cause of action,[27] we decline Mr. Douglas' invitation to recognize such a cause of action at this time. *See, e.g., Howard v. Estate of Harper ex rel. Harper,* 947 So.2d 854, 861–62 (Miss.2006) (" 'If the Court were to find a fiduciary relationship between Plaintiff and [the nursing home licensee and administrators], then a reasonable inference could be made that each and every employee of [the nursing home], from the janitorial staff who cleaned Plaintiff's room to the chief executive officer who established policies and procedures for [the nursing home], owed a fiduciary duty to the Plaintiff. The [nursing home licensee and administrators] were primarily responsible for the management of [the nursing home], a responsibility that typically does not create a fiduciary duty.' " (quoting *Gray v. Beverly Enters.-Miss., Inc.,* 261 F.Supp.2d 652, 662–63 (S.D.Miss.2003), *rev'd on other grounds,* 390 F.3d 400 (5th Cir.2004))). Accordingly, we conclude that the circuit court erred in recognizing a cause of action for breach of fiduciary duty against a nursing home, and we dismiss this cause of action. (Brackets sic.)

*Manor Care, Inc.* at 77 (In footnote 27, the "small number of jurisdictions" the court referred to were three cases that allowed a breach of a fiduciary duty claim brought by a nursing home resident to survive a motion for judgment on the pleadings or a summary judgment motion: *Petre v. Living Ctrs.-East, Inc.*, 935 F.Supp. 808, 812 (E.D.La.1996) (allowing a breach of fiduciary duty claim to survive summary judgment, "The burden of proving that a fiduciary relationship existed in this case still lies with the plaintiff but such a factual determination in [sic] more properly handled at trial and not on a motion for summary judgment"); *Greenfield v. Manor Care, Inc.*, 705 So.2d 926, 932

(Fla.Dist.Ct.App.1997) (reversing the trial court's dismissal of entire complaint and concluding that because the plaintiff "properly alleged a fiduciary duty between Manor Care and it [sic] residents, which arose out of a special relationship independent of the contract, and a breach of same," the trial court erred in dismissing the breach of fiduciary duty claim); and *Zaborowski v. Hospitality Care Ctr. of Hermitage, Inc.*, 60 Pa. D. & C. 4th 474, 488–89 (Pa.Com.Pl.2002) (trial court allowed a breach of fiduciary duty claim to survive a demurrer, but noted "[t]his court, however, is reluctant to broadly hold that a nursing home resident is always subject to the 'overmastering dominance' of the nursing home. Instead, like other courts that have previously addressed this issue, this court holds that the nature of the relationship between the nursing home and its resident must be determined on a case by case basis and the burden of establishing such a relationship rests with the plaintiff"); *see also Cunningham v. Kentmere Rehab. & Healthcare Ctr., Inc.*, C.A. No. N20C-10-287 VLM, 2021 WL 1157991, *4 (Del. Supr. Ct. Mar. 25, 2021) (allowing a breach of fiduciary duty claim against a nursing home to survive a motion to dismiss, "the burden of proving that the relationship exists remains on Plaintiff, but the claim cannot be dismissed at this stage. Defendants may renew their dispositive motion after discovery, if appropriate").

{¶70} A Connecticut federal court declined to impose a fiduciary relationship upon a long-term care facility and its resident. It dismissed a breach of fiduciary duty claim asserted by an adult mentally disabled client against Chapel Haven, a facility that provided lifetime care services to developmentally disabled adults, reasoning that it is "a task for the legislature" to impose "a heightened duty upon an entire industry":

> The plaintiffs may be arguing more generally that because decisions made
> by entities that provide care to the mentally disabled have such an outsize

impact on the recipients of their services, those entities owe a special duty to make all such decisions with care and a bias towards the needs of the recipient. *See Petre*, 935 F. Supp. at 810 (using that reasoning to impose a general fiduciary duty on a nursing home, which it found was breached by providing inadequate care). That argument does not, however, seem appropriate for a fiduciary duty claim. First, imposing a heightened duty on an entire industry is a task for the legislature or, at least, the Connecticut Supreme Court—as discussed above, Connecticut already has a list of "per se" fiduciary relationships, not including care providers. Second, the foreseeable harms caused by an allegedly arbitrary and capricious termination of services are already addressed through several of the other causes of action raised in this complaint, including the breach of contract and the implied covenant claims, and the negligent infliction of emotional distress claim. Accordingly, I **grant** the motion to dismiss the breach of fiduciary duty claim. (Emphasis sic.)

*Edelson v. Chapel Haven, Inc.*, D. Conn. No. 3:15-cv-1862 (SRU), 2017 WL 810274, *19

(D. Conn.).

**{¶71}** In *Lykins, supra,* the Ohio case cited by the Defendants, the court stated

that a patient's action arising out of a physician's negligence is based in malpractice, not

contract. Therefore, where the plaintiff has raised a malpractice claim in the complaint, it

was proper to dismiss the plaintiff's claim for breach of a fiduciary duty. The breach of

fiduciary duty claim was encompassed in the negligence claim.

**{¶72}** In *Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 729

N.E.2d 768, (8th Dist. 1999), a nursing home alleged that a resident's stepdaughter, who

was the resident's attorney-in-fact, had a fiduciary duty to the resident via the power of

attorney and therefore also had a fiduciary duty to the nursing home to ensure that the

resident's nursing home bills were paid.  The court rejected this argument and granted

summary judgment dismissing the nursing home's claim for breach of fiduciary duty. The

court recognized that an attorney-in-fact has a fiduciary duty to the principal, but the

nursing home failed to show how this duty extended beyond the principal to third parties

like the nursing home. In discussing the relationships between the parties, the court

describe the relationship between a nursing home and its resident as one of "debtor and

creditor."

> At most, the relationship between that of the nursing home and [its resident] Nelson was that of debtor and creditor. The Ohio Supreme Court has repeatedly held that, without more, the relationship of debtor and creditor does not constitute a fiduciary relationship. See, *e.g., Stone v. Davis* (1981), 66 Ohio St.2d 74, 78, 20 O.O.3d 64, 66–67, 419 N.E.2d 1094, 1097–1098 (citing *Umbaugh Pole Bldg. Co. v. Scott* [1979], 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320.) A fiduciary relationship arises only when the parties, by contract or less formal relationship, understand that a special trust or confidence has been reposed. *Id.*

> No such understanding between any parties was alleged or established in the case at bar. Because [the resident] Nelson did not owe any fiduciary duty to the nursing home, and the nursing home has not shown any independent basis for establishing such a relationship directly with [the attorney-in-fact] Mayne, it has not shown that it can recover against Mayne derivatively on this theory. (Brackets in *Umbaugh* citation sic.)

*Id.* at 674.

{¶73} In *In re Estate of Hill*, we explained that a formal written agreement is

generally required to create a fiduciary relationship. However, a fiduciary relationship may

arise  informally when both parties understand that a special trust has been reposed:

> A fiduciary relationship is "one in which special confidence and trust is placed in the integrity and fidelity of another, who acquires a resulting position of superiority or influence by virtue of this special trust." A fiduciary relationship generally is formed through a formal document. A fiduciary relationship may be created out of an informal relationship, but only "when both parties understand that a special trust or confidence has been reposed." However, a mere friendship in which a person renders gratuitous assistance to a friend does not give rise to a confidential or fiduciary relationship. (Citations omitted.)

*In re Estate of Hill*, 4th Dist. Scioto No. 99CA2663, 2000 WL 326134, *3 (Mar. 15, 2000).

{¶74} To maintain a claim of breach of a fiduciary duty, a plaintiff must prove: (1)

the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the

duty; and (3) an injury resulting proximately therefrom. *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988). O'Dell has failed to present any evidence of a formal document creating a fiduciary relationship between Bebea and Abbyshire. Similarly, O'Dell has failed to present any evidence that the parties mutually, bilaterally and informally established a fiduciary relationship. *See Hanick v. Ferrara*, 2020-Ohio-5019, 161 N.E.3d 1, ¶ 77-78 (7th Dist.) (factors considered when determining if a fiduciary relationship has been created out of an informal relationship is the number of years the relationship existed, whether the party alleging the existence of a fiduciary relationship communicated a reliance that indicated that the party reposed a special trust in the other, and whether there was any evidence of a bilateral or mutual understanding that the ordinary business relationship had been converted into a fiduciary one).

**{¶75}** Ohio does not recognize a common law or statutory fiduciary relationship between a nursing home and its residents. O'Dell presented no evidence the parties, either formally or informally, contractually created a fiduciary relationship. Therefore, the trial court did not err when it dismissed the breach of fiduciary duty claim.

### 5. Premises Liability

**{¶76}** Count Eleven alleges a claim for premises liability. O'Dell contends that Abbyshire created and knew of a dangerous condition and failed to warn or remedy the dangerous condition. The Defendants argued that this was simply a medical negligence claim disguised with another name and asked to have it dismissed. O'Dell argued that his expert testimony established this claim, though he did not state which expert's testimony supported it and he did not cite to portions of deposition testimony that he believed

supported this claim. The trial court determined that the premises liability claim was the same as the medical claim and dismissed it.

{¶77} To survive summary judgment, O'Dell had to establish that a genuine issue of material fact existed on each of the elements of premises liability. "In Ohio, the status of the person who enters upon the land of another (*i.e.,* trespasser, licensee, or invitee) continues to define the scope of the legal duty that the landowner owes the entrant. Invitees are persons who rightfully come upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner." *Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 315, 662 N.E.2d 287, 291 (1996). A business owes invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition so that its customers are not unnecessarily and unreasonably exposed to danger. The business is not, however, an insurer of the customer's safety. Further, a business is under no duty to protect business invitees from dangers "which are known to such invitee or are so obvious and apparent to such invitee that he may reasonably be expected to discover them and protect himself against them." *Paschal v. Rite Aid Pharmacy, Inc.*, 18 Ohio St.3d 203, 203–04, 480 N.E.2d 474, 475 (1985). A resident of a senior-living home offering assisted living and skilled nursing care is "at least owed the due care as exercised by a reasonably prudent person under the circumstance to prevent foreseeable harm." *Perko v. Healthcare Servs. Group, Inc.*, 8th Dist. Cuyahoga No. 110267, 2021-Ohio-4216, ¶ 7 (resident slipped on waxed floor of community room; court found landlord tenant duties established under R.C. 5321.04 inapplicable to nursing homes, granted summary judgment to nursing home where it hired independent contractor to wax floors).

> In a premises liability case against an owner or occupier, an injured plaintiff must show 1) that the owner or one of its employees had actual knowledge of the hazard and neglected to give adequate notice of it or remove it promptly; or 2) that the danger had existed for a period of time sufficient to justify the conclusion that the failure to warn against it or remove it was attributable to a lack of ordinary care.

*Cohen v. Meridia Health Sys.*, 8th Dist. Cuyahoga No. 87001, 2006-Ohio-3593, ¶ 14.

In *Cohen*, a woman transporting herself in an electric wheelchair down an aisle in the waiting area of a hospital turned her wheelchair around and bumped into a nearby chair. Shortly thereafter the woman noticed that her leg was bleeding profusely. However, there was no evidence of the cause of the cut. The woman contended there must have been a sharp metal sticking out of the chair she bumped into that caused her injuries. However, she had seen nothing abnormal about the chair and did not see any metal protruding from it. The court granted summary judgment against her and in favor of the hospital on her premises liability claim because she was unable to identify any hazard.

> "Negligence shall not be presumed absent an affirmative demonstration from the evidence." Thus, in the context of injuries to plaintiffs resulting from a fall, this court and others have clearly held that mere speculation about the cause of an injury is insufficient to establish liability on a negligence claim. In *Johnson v. Duncan,* Cuyahoga App. No. 86074, 2005-Ohio-5726, at ¶ 11, this court stated:
>
> " 'As such, a plaintiff will be prevented from establishing negligence when he, either personally or with the use of outside witnesses, is unable to identify what caused the fall. In other words, a plaintiff must know what caused him to slip and fall. A plaintiff cannot speculate as to what caused the fall." '
>
> The same reasoning applies here. Cohen cannot identify any defect with the chair at issue. She assumes that a piece of metal sticking out from the chair caused her injury when she bumped the chair, but such an assumption is nothing more than mere speculation. She does not know what caused her injury and consequently, presented no evidence of a defect on the premises. (Citations omitted.)

*Cohen* at ¶ 11-13.

**{¶78}** Here it is not known what hazard, if any, caused Bebea's fall. There is no evidence that Bebea slipped and fell on anything hazardous on the floor. O'Dell does not cite to any witness testimony that identified any hazard that caused Bebea to slip and fall. He devotes one sentence in his brief arguing that all the elements of premises liability "are met by the expert testimony described herein * * *." Yet, as in his opposition to the summary judgment motion, he failed to identify any specific witness testimony that meets any of the elements of premises liability. The premises liability claim has no merit and does not even seem to fit O'Dell's general theory of the case. *Eastley v. Volkman*, 4th Dist. Scioto No. 09CA3308, 2012-Ohio-4528, ¶ 21 (finding that premises liability principles did not seem to fit the plaintiff's theory of the case, i.e., the decedent was not injured by any physical defects on the premises but by medical malpractice related to improperly prescribed drugs.). The trial court did not err when it dismissed the premises liability claim in Count Eleven.

### 6. Summary

**{¶79}** We find that O'Dell presented sufficient evidence to survive summary judgment on one claim: the claim that Abbyshire's negligence resulted in Bebea's fall, injuries, and death. This is a general negligence claim, not a medical claim, because Bebea's fall occurred at approximately 1:30 a.m. while she was alone in her room and did not involve the use of medical equipment and did not occur as part of a medical test, procedure, or treatment. O'Dell's general negligence claim is set forth in Counts One/Two. The trial court erred in dismissing Counts One/Two and we reverse the dismissal of those counts. The nursing home negligence claim in Counts Four/Five is redundant and was

properly dismissed. The medical negligence claim set forth in Counts Six/Seven should have been dismissed. The trial court erred in determining that O'Dell's single claim was a medical claim and in allowing Counts Six/Seven to stand. We dismiss Counts Six/Seven.  In other words, we agree with the trial court that there is only one claim, but we find that it is a general negligence claim, not a medical claim. Therefore, we allow the case to proceed on Counts One/Two rather than Counts Six/Seven.

{¶80}  The remaining claims for punitive damages, fraud, breach of fiduciary duty and premises liability were properly dismissed by the trial court because O'Dell failed to raise a genuine issue of material fact as to any of those claims. The trial court properly dismissed Counts Eight, Nine, Ten, and Eleven. We sustain, in part, and overrule, in part, O'Dell's first assignment of error.

### C. Dismissal of Vrable Healthcare, Inc.

{¶81}  In his second assignment of error, O'Dell contends that the trial court erred in dismissing Vrable Healthcare. Vrable Healthcare provided certain management level employees to Abbyshire, like administrator Long, and direct services to the home's residents via its therapists. Vrable Healthcare is also the sole shareholder of Vrable III (i.e., Abbyshire), though this irrelevant fact has done nothing but spawn a red herring – corporate veil piercing.

{¶82}  The trial court found that Vrable Healthcare, as the sole shareholder of Vrable III, was not liable for alleged torts committed by Vrable III under a corporate veil-piercing theory.  However, we found no attempt by O'Dell to use corporate veil piercing to hold Vrable Healthcare liable for Vrable III's alleged torts. And, despite the trial court's reference to "Defendants citing *Belvedere*" we found nowhere in the Defendants'

summary judgment motion or their reply brief where *Belvedere Condominium*, 67 Ohio St.3d 274, 1993-Ohio-119, 617 N.E.2d 1075, the leading corporate veil piercing case, was cited or discussed to defend against a veil piercing attempt. To the contrary, at the oral argument on the motion, defense counsel stated that plaintiff was not raising corporate veil-piercing:

> What seems kind of unclear is this control factor. Um, is something that's relevant if a claim is based on veil piercing. That a corporate parent is going to be held liable for the actions of a subsidiary because they are an alter ego of the subsidiary. *Plaintiff's never made that kind of claim* so this control analysis, I don't know where it fits in * * *. (Emphasis added.)

**{¶83}** The trial court seemed to incorrectly infer that a corporate veil piercing theory was being raised in this case, "Here, Defendants appear to be arguing that Plaintiff, by bringing claims against Vrable Healthcare, Inc. the parent, is attempting to pierce the corporate veil."

**{¶84}** We find no attempt by O'Dell to pierce the corporate veil and argue that, as the sole shareholder, Vrable Healthcare is liable for the alleged negligence of Vrable III. Instead, O'Dell is attempting to hold Vrable Healthcare liable in two other ways: (1) directly liable for what he alleges are negligent acts by Vrable Healthcare and (2) liable via respondeat superior for the alleged negligent acts of Long. Nevertheless, we find the trial court's corporate veil piercing analysis irrelevant because it ultimately dismissed Vrable Healthcare on other grounds (i.e., it found no evidence of negligence).

**{¶85}** In its summary judgment motion, the Defendants argued that Vrable Healthcare should be dismissed because none of the staff it employed at Abbyshire provided care to Bebea. They argued that O'Dell's expert witnesses provided no testimony of any specific act or omission of Vrable Healthcare that constituted a breach

of the standard of care that was a proximate cause of injury to Bebea. O'Dell responded by arguing that Vrable Healthcare's Civ.R. 30(B) witness testified that Vrable Healthcare oversaw Abbyshire to ensure regulation compliance, reviewed the budget, provided employee handbooks, and employed certain management level employees at Abbyshire. O'Dell also argued that Dr. Fannin and Nurse Hill-O'Neill both "offered opinions related to any entity involved in the operation of the facility, thus including Vrable Healthcare, Inc."

{¶86} The trial court closely examined Dr. Fannin and Nurse Hill-O'Neill's testimony concerning Vrable Healthcare. After quoting significant portions of relevant deposition testimony of both witnesses, the trial court determined that neither expert could identify any negligent act by Vrable Healthcare that caused Bebea to fall and suffer injuries:

> Neither of Plaintiff's experts had specific criticism of Vrable Healthcare, Inc. They were unable to identify this Defendant separate and distinct from the others. They had no opinion relating to Vrable Healthcare, Inc., specifically and gave no opinion regarding this defendant that it violated any standard of care. Furthermore, even if a standard of care violation had been shown, they gave no opinion that it specifically caused injury to Bebea Joyce O'Dell.

{¶87} On appeal, O'Dell contends that "Vrable Healthcare, Inc. owed a duty to Bebea O'Dell, breached that duty, and such breach was the proximate cause of her injuries." O'Dell explains that Vrable Healthcare had certain oversight duties to ensure Abbyshire followed government regulations, engaged in union negotiations, provided employee handbooks, and reviews its budgets. But he makes no connection between these duties and Bebea's fall. There is no evidence that any of these oversight and management duties created any duty to Bebea or involved her care in any way. We reviewed and summarized both experts' testimony previously. They testified that Bebea's fall was caused by inadequate fall prevention measures, with Dr. Fannin opining that the

fall would have been prevented by a bed alarm and Nurse Hill-O'Neill stating that a bed alarm, along with blue floor mats, and a lower mattress would have prevented the fall. There was no testimony that Vrable Healthcare had any duties or responsibilities to make fall risk assessments of or implement fall prevention measures for the residents at Abbyshire.

{¶88} Instead, several witnesses testified that employees of Vrable III were responsible for fall assessment and prevention. Amber Frum, the director of nursing at the time of Bebea's fall, testified that Abbyshire's nursing staff performed the MDS (Minimum Data Set) assessment, the admissions evaluation, and a baseline care plan upon admission which included fall risk assessments and fall interventions for Bebea when she was admitted in August 2018.

{¶89} The Civ.R. 30(B) witness, James Merrill, testified about the corporate structure of Vrable III and Vrable Healthcare.   He testified that Vrable III is the employer of all employees at Abbyshire, except for the administrator, the director of nursing, the senior business office manager, and the therapists. Therefore, the nursing staff that performed the fall risk assessment and fall intervention were employees of Vrable III, not Vrable Healthcare.

{¶90} O'Dell attempts to hang liability on Vrable Healthcare with Dr. Fannin's "whole ball of wax" theory:

> Q. Would it be fair to say that your opinions regard the Abbyshire Place caregivers in this case?
>
> A. I don't think that's fair. I think that it's –it's the whole ball of wax. You can't – whoever owns it, runs it, operates it, and is involved in it, they're all responsible, okay. And so I don't pick out who's responsible for what, particularly. I look at the total sum of the care that's given or not given to the patient and arrive at my opinion.

* * *

Q. Okay. Do you have any opinions with regard to Vrable Healthcare, Inc. one of the defendants in this case?

A. I don't know who that is.

Q. Okay. And you don't know what the entity does, fair?

A. I don't.

However, in Dr. Fannin's own words, he does not "pick out who's responsible for what" – he only renders an opinion about "the care that's given or not given to the patient." Dr. Fannin opined that Babea's fall was caused by a failure to accurately assess her fall risk and take adequate measures to prevent the fall. O'Dell cannot rely on Dr. Fannin to make the connection between Vrable Healthcare and Bebea. Dr. Fannin did not know what Vrable Healthcare was or what it did.

**{¶91}** Similarly, Nurse Hill-O'Neill did not identify the role, if any, Vrable Healthcare had in the residents' fall assessment and prevention. She was aware that Vrable Healthcare was somehow involved because she saw the Vrable Healthcare name on "forms" and "policies and procedures" and "that would mean that they're involved in the facility [Abbyshire]. That's the only way I can tell you right now." Other than her vague understanding that Vrable Healthcare was "involved" with Abbyshire, Nurse Hill-O'Neill did not testify that Vrable Healthcare conducted Bebea's fall risk assessment or implemented fall prevention measures.

**{¶92}** O'Dell has presented no evidence that Vrable Healthcare had any duties to Abbyshire residents to conduct fall risk assessments and implement prevention measures. Instead, those duties were the responsibility of Vrable III employees. Because

Vrable Healthcare had no duties to Bebea, it cannot be held directly liable for the injuries Bebea suffered. However, Vrable Healthcare could have liability under respondeat superior if an employee it hired at Abbyshire, specifically administrator Long, conducted Bebea's fall risk assessment and implemented her fall prevention. However, as we determined below in reviewing O'Dell's third assignment of error concerning Long's dismissal, Vrable Healthcare has no respondeat superior liability to Bebea because there was no evidence that Long was responsible for the Bebea's fall risk assessment or fall prevention. Because Long was not negligent, Vrable Healthcare does not have respondeat superior liability and was properly dismissed as a party in this case.

{¶93} The trial court did not err when it dismissed Vrable Healthcare. We overrule O'Dell's second assignment of error.

## D. Dismissal of Jeremy Long

{¶94} In his third assignment of error, O'Dell contends that the trial court erred in dismissing the claims against Jeremy Long, Abbyshire's administrator, set forth in Count Three. The Defendants argued that, as Abbyshire's administrator, Long "was responsible for oversight and management at the facility including business operations, budgetary compliance, and supervision of staff" but he "does not provide direct, hands-on care to residents at Abbyshire Place." O'Dell argued that Long is liable for Bebea's fall because he "was responsible for planning, organizing, directing, controlling, and operating Abbyshire Place during [Bebea's] residency." O'Dell argued that Bebea's injuries "were a direct and proximate result of [Long's] negligent conduct, which evidenced a disregard for the health and safety of [Bebea]."

**{¶95}** O'Dell makes a very broad argument that because Long was responsible for oversight and management of Abbyshire and Bebea fell while he was the administrator, then he engaged in negligent conduct that resulted in her fall. O'Dell also argues that because Long was responsible for ensuring adequate staffing and there were "staffing issues" mentioned in an email, then this "creates a genuine issue of material fact as to whether Defendant Long ensured that Abbyshire Place was adequately staffed, and therefore, whether he breached his duty to operate that facility in a manner that ensured [Bebea's] highest practicably physical, mental, and psychosocial well-being."

**{¶96}** Long testified that he conducted daily staff meetings with the director of nursing, the clinical manager, and the human resource manager to discuss any call-offs or other open positions and decide if there are staff shortages. If they identify a shortage, then they call in staff to fill those spots. Long testified that he shared staffing oversight duties with the director of nursing and the clinical manager. However, if a staff member called off after the schedule was set, the staffing vacancy was handled by the nurse supervisor for the evening shift. Long also explained that Abbyshire had "PRN staff" which were staff members who would be called in to work on an as-needed basis if a vacancy arose due to a vacation or other absence. Long testified that during the time Bebea was at Abbyshire, he could not recall receiving any complaints about lack of staffing.

**{¶97}** Amber Frum, corporate director of nursing at Vrable Healthcare and the director of nursing at Abbyshire from 2011 to December 2018, testified that Abbyshire had a low staff turnover rate and received quality points from the government in 2018 for their low turnover. Frum was unaware of any complaints about Abbyshire having

insufficient staffing.  O'Dell argued that Frum testified that there were staff shortages on several days, including the day Bebea fell. However, in the deposition testimony O'Dell cites, Frum testified that the records she reviewed for early September 2018 included budgeted and actual staffing hours, and that some days appeared to have excess staffing hours and other days appeared to have insufficient staffing hours. Frum testified that, based upon the documents shown to her at her deposition, she could not determine whether adjustments were made to correct the over and under staffing hour figures shown on the report: "We could have made adjustments that aren't listed here. Like, there's managers on the floor that might not be shown here." Frum confirmed that for a staffing report for September 5, 2018, she could not tell based on the document whether budget shortages were corrected:

> Q. And this document indicates, at least on its face, that they were 24 hours short of the budgeted PPD [per person, per day]; right?
>
> A. Yes.
>
> Q. And you can't tell me from looking at this that shortage was corrected; is that right?
>
> A. Correct.

*          *          *

> Q. And my client suffered a fall on or about September 6th at sometime around 1:00 to 2:00 a.m. in the morning, * * *. But I just wanted for completeness to show you this.  So on the next day, September 6th, it appears that there was a shortage of 2.25 hours for that day; correct?
>
> A. Yes.

{¶98} Construing Frum's testimony most strongly in O'Dell's favor, the most we can determine is that Abbyshire may have been understaffed by 24 and 2.25 staffing hours the day prior to and the day of Bebea's fall, respectively. However, even if we

assume Abbyshire was understaffed during the time Bebea fell, there is no testimony that understaffing caused or contributed to Bebea's fall. There was no testimony about the appropriate staffing ratio required to meet a standard of care. There was no testimony that understaffing occurred in the "Living Center" area of Abbyshire, which was the secured Alzheimer unit where Bebea resided. And, neither of O'Dell's expert witnesses blamed Bebea's fall on understaffing problems. Instead, they blamed inappropriate fall risk assessment during admission and inadequate and improper fall intervention implementation.

{¶99} As we discussed previously, Dr. Fannin testified "I don't pick out who's responsible for what" and when asked if he had any opinions with regard to Jeremy Long, he responded, "Who is that?"

{¶100}     Nurse Hill-O'Neill was very vague in her testimony concerning the administrator. She testified that she believed Abbyshire was not in compliance with certain state and federal regulations governing fall risk assessment and implementation, though she did not identify this with any specificity. She testified that it is the administrator's role to ensure that a facility is compliant though she did not testify how this related to any staffing issue or to Bebea's fall. She gave no opinion that Long was negligent in carrying out his role. Even if we assume that there was a violation of a regulation, it does not establish Long was negligent per se. *Lang v. Beachwood Pointe Care Ctr.*, 2017-Ohio-1550, 90 N.E.3d 102, ¶ 74 (8th Dist.) (violation of regulation not negligence per se). In other words, a nursing home may violate a regulation without any negligence on the part of its administrator. Nurse Hill-O'Neill did not testify how the

administrator's duties related to, caused, or contributed to Bebea's fall. She did not know who Jeremy Long was:

> Q. Do you have any opinions with regard to Jeremy Long, one of the defendants in this case?
>
> A. Only if he's responsible for oversight or management of the building. Anybody that's responsible or involved in that.
>
> Q. But as you sit here today, you do not know what he does specifically?
>
> A. Correct.

**{¶101}** We find no genuine issue of material fact concerning Long's negligence. There was no evidence that Long was negligent in carrying out his duties as administrator. The trial court did not err in dismissing Count Three and in dismissing Long as a party to the case. We overrule O'Dell's third assignment or error.

## IV. CONCLUSION

**{¶102}** We sustain in part and overrule in part O'Dell's first assignment of error. We reverse the dismissal of Counts One/Two, dismiss Counts Six/Seven and affirm the trial court's dismissal of Counts Four/Five and Counts Eight through Eleven. We overrule O'Dell's second assignment of error and affirm the trial court's dismissal of Vrable Healthcare, Inc. We overrule O'Dell's third assignment of error and affirm the trial court's dismissal of Jeremy Long and Count Three. The case is remanded for further proceedings consistent with this opinion.

JUDGMENT REVERSED IN PART,
AFFIRMED IN PART. CAUSE REMANDED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS REVERSED IN PART, AFFIRMED IN PART, CAUSE REMANDED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
           Michael D. Hess, Judge




## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**